CHESAPEAKE TRANSIT CO. v. WALKER & SON et al.

(Circuit Court, E. D. Pennsylvania. January 20, 1908.)

No. 34.

1. PRINCIPAL AND SURETY—DISCHARGE OF SURETY—MAKING NEW AND DIFFERENT CONTRACT.

The surety on a contract for the construction of a railroad for a lump sum, which contract the principal wholly failed to perform, is discharged from liability by the making of a new contract by the railroad company with another contractor, which, as a whole, differed materially from that on which the surety was bound.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Principal and Surety, §§ 162–165.]

2. SAME.

Plaintiff, a railroad company, contracted for the construction of a line of road, and defendant became surety on the contractor's bond. The contract was for a lump sum, and the contractor failed wholly to perform, whereupon plaintiff entered into a contract with another for the construction of the road, which differed from the first, inter alia, in that under the first the road was to be a steam road only, while under the second it was to be equipped for both steam and electricity; the specifications of the two contracts differed materially as well as the time given for completion of the work, and the method and means of payment differed so largely that they could not well be compared. Held, that such differences were material, and their effect was the same as though they had been introduced into the original contract without defendant's consent, and released him from liability.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Principal and Surety, §§ 162–165.]

3. DAMAGES—CERTAINTY—EVIDENCE—SUFFICIENCY.
 Evidence of the damages sustained by plaintiff from a breach of contract *held* too uncertain to sustain a recovery.
 [Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Damages, § 5.]

On Motion for New Trial.

Wm. A. Glasgow, Jr., for plaintiff.

V. Gilpin Robinson, for Abram C. Mott.

J. B. McPHERSON, District Judge.  This is an action brought against Abram C. Mott (who alone was served with process), the surety upon a bond conditioned for the faithful performance by Walker & Son, his principals, of a contract to build and equip a railroad.  The principals having failed to carry out the contract, and the road having thereupon been built and equipped by another contractor at a higher price, the surety is now called upon by the company to make good the loss that is said to have been sustained.  Two defenses were set up at the trial:  First, that a provision in the contract concerning the preliminary examination and approval of certain titles by the counsel for the surety and his principals had not been complied with, and, therefore, that the contract to build never took effect; and, second, that the agreement under which the road was afterwards constructed differed so materially from the first agreement that the surety was relieved from liability upon his bond.  As will be observed, each of these defenses raises a question that is vital to the company's case, and defeat upon either, therefore, would be as fatal as defeat upon both.  They were submitted to the jury as questions of fact, and I believed at the trial, as I believe now, that the evidence offered concerning the first question was of such a character as to compel submission to that tribunal, and forbid determination by the court.  But I had serious doubt whether the evidence upon the second question was similarly effective; and, if I had been obliged to decide upon its sufficiency after counsel had finished their arguments, I should have sustained the second defense, and should have instructed the jury then to find in favor of the defendant.  In the hope, however, that the jury might settle the controversy by their verdict, I submitted the second defense also, but retained control of the subject by an appropriate reservation.  After a prolonged effort the jury could not agree, and, in order to avoid what I then thought would be the useless formality of a second trial, I followed my first impressions, and directed a verdict in favor of the defendant.  I have now had an opportunity to consider the evidence at leisure, assisted by the able and exhaustive arguments and briefs of counsel, and I find that my opinion at the close of the trial has been fully confirmed.  Laying the first defense aside, therefore, since it need not now be dwelt upon, I think that a brief statement of the undisputed facts relating to the second defense will show it to be sufficient of itself to prevent the plaintiff from recovery.  For this conclusion two reasons will appear:  First, because the first contract was so materially altered by the second that the obligation of the surety was discharged; and, second, because, even if the plaintiff had a valid claim to recover a part of the difference between the cost of construction under one,

and the other, contract, the evidence concerning this part was not sufficiently definite to justify its submission to the jury. The uncontroverted facts will, I think, show clearly that the surety cannot properly be called upon in this action to respond in damages.

It is to be borne in mind throughout that the suit is against the surety alone, and, therefore, that the established principles limiting a surety's liability must be applied. In many of the decisions to be found in the books, the surety has been relieved because, in the carrying out of the original contract, for whose fulfillment he was bound, the obligation of his principal had been materially changed by agreement with the other contracting party. Where such a change has been made, it is familiar law that the surety is discharged, and that the courts will not inquire whether the change hurt him or helped him. Ziegler v. Hallahan (C. C. A.) 131 Fed. 205, 66 C. C. A. 1; Shelton v. American Surety Co. (C. C. A.) 131 Fed. 210, 66 C. C. A. 94. The sole question is, was the alteration material? And, if the answer is in the affirmative, it is then for the surety to decide whether he is willing to be bound by a contract to which he did not agree. Of course, he may waive the defense if he chooses, but, if he declines to submit to the changed agreement, he is discharged from the original obligation. It is, perhaps, more exact to say that the original obligation does not become effective, so far as the surety is concerned, because a substantially new obligation has been substituted therefor, and that no recovery can now be had against the surety upon either; not upon the first, because the parties have, in effect, abandoned it; and not upon the second, because to this the surety did not agree. While the present suit does not arise in precisely this way, the situation is so closely analagous that the legal principles just referred to are still pertinent. The defendant here agreed as surety that a certain contract should be carried out as a whole by his principals; there was a complete failure to fulfill on the part of the principals, and, by their default, the surety became immediately bound to make good whatever damage the other contracting party might suffer in an effort to have this particular engagement carried out as a whole by other persons. But, concededly, the first agreement, to which alone the engagement of the surety referred, was neither undertaken nor actually fulfilled by the second contractor. A new agreement was entered into, differing in many particulars from the first; and manifestly, therefore, the surety cannot be affected by what was done under the second contract, to which he did not agree, unless the differences between the two agreements are differences in details merely, and do not go so far as to make material and substantial changes. In order to determine how much, and how importantly, the second contract differs from the first, it will be necessary to examine both, and then to decide whether the differences that undoubtedly exist may be neglected as immaterial, or whether they are so great that the defendant has thereby been relieved from his obligation. He did not bind himself separately to the performance of each item among the number that are comprised in the agreement, but he promised that the whole engagement of his principals—although it was made up of many items—should be carried out;

and therefore he cannot be affected by the execution and performance of another contract that is materially different as a whole from the agreement to which his obligation refers. Slight differences may not relieve him, but if, separately or in the aggregate, the changes are material, he cannot be bound by the action of other persons to which he did not consent.

The first contract is to be gathered from two writings, both signed by Walker & Son and the Chesapeake Transit Company. By the writing dated September 13, 1900, the contractors obligated themselves:

"1. To lay out and construct a standard gauge railroad, not exceeding 16 miles in length, from a point to be designated by the said company in or near the city of Norfolk, Virginia, by as straight a line as practicable, to Lynn Haven Inlet, and around Cape Henry, through and upon Atlantic avenue, and equip the same ready for operation, in accordance with the estimates and specifications compiled by J. Taylor Gleaves (a copy of which is hereto attached) but instead of laying 56 pound rails, it is understood and agreed that 65 pound relay rails shall be used, with an aggregate cost not to exceed the aggregate cost of 60 pound rails laid new for the same distance. Said work to be done within 5 months from the date said contractors shall commence work.

"2. If the said company shall increase the distance of said railroad from 16 to 20 miles, the cost of laying the extra 4 miles of track shall be on the same basis.

"3. If the said company shall desire to extend its line a greater distance, such extension shall be made upon the same basis of cost for laying the said track over like ground.

"4. If the said company shall desire to reduce its mileage to a distance not less than 16 miles, or to reduce its equipment or any other item or items in the contract, the contract price shall be correspondingly reduced.

"5. The said contractors are to furnish bond with security to be approved by the said company for the faithful performance of their contract, and to commence work as soon as security approved by the said contractors is furnished by the said company, that the cash portion of the contract price shall be paid within ten days after a complete fulfillment of said contract by the said contractors."

## Upon its part, the company bound itself as follows:

"1. To pay to the said contractors the sum of $277,878 for the construction and equipment of the said 16 miles of track as set forth in the before-mentioned paragraph 1, and at the same rate for the hereinbefore stipulated increased distance, as follows:

"(a) Two-thirds of said contract price in first mortgage 5% gold bonds of the said company, duly issued, payable 30 years after their date at 80 cents. The said issue of bonds not to exceed $25,000 per mile, or $450,000 if the mileage is reduced to 16 miles. Said mortgage to bind all the property and franchises of the said company acquired or to be acquired. This is to include a tract of 50 acres of land at Cape Henry, the title to which is to be clear and unincumbered, and which land is to be used as a railroad terminal. Said bonds to be duly issued and delivered to the said contractor, upon the approval of the bond stipulated to be furnished by them under paragraph 5 of this agreement.

"(b) The balance of the contract price to be paid in cash to the said contractors or their assigns within 10 days after the road is completed, and equipment furnished in accordance with the terms of this contract.

"(c) To pay and deliver to the said contractors or their assigns upon the acceptance of their bond 20% of the authorized capital stock (of $100,000) of said company, fully paid and nonassessable.

"(d) In order to ensure at least 2 years' interest upon the hereinbefore recited bonded indebtedness, the said company shall, when the bond of the said contractors for the completion of the contract is approved, forthwith pay and

deliver at least $55,000 (or as many as shall be necessary) of said first mortgage bonds, to some depository to be agreed upon, which bonds are to be sold by the said company at not less than 20% below their face value, and the proceeds to be deposited and held by the said depository, and applied to the payment of the interest on the said first mortgage bonded indebtedness as it shall accrue, said fund to be used for no other purpose.

"2. It is understood and agreed that this contract shall not be binding unless:

"(a) The said company has, or shall have before any work is commenced, all the franchises and rights from property owners, and the proper authorities, to construct and operate the road over the proposed route. The validity of all of which shall be determined and approved by the counsel for the said contractors.

"(b) The hereinbefore mentioned mortgage and bonds to be issued thereunder shall have been duly issued, and their validity approved by the said counsel. It being understood that the said mortgage so to be issued shall cover all the property and franchises of the said company, including 50 acres of land in Cape Henry, the title to which is to be clear, which land is to be used as a railroad terminal, and upon which is to be erected the necessary buildings for the company, stipulated for in the contract and specifications."

As will be observed, this paper recites that certain "estimates and specifications compiled by J. Taylor Gleaves" are attached, and that the road is to be built and equipped in accordance therewith; but only an estimate made by Mr. Gleaves was offered in evidence, and we do not know what the specifications contained, except as their contents may be inferred from the estimate, of which a summary is as follows:

| | |
|---|---:|
| Grading, 16 miles at $954 | $ 15,264 00 |
| Grading, 1 mile siding at | 954 00 |
| Drainage, 17 miles at $50 | 850 00 |
| Superstructure, 16-1-17 miles at $5,659 | 96,203 00 |
| 2,000 ft. Bridge | 7,700 00 |
| 350 ft. Bulkhead (lake) | 3,220 00 |
| Stations and buildings | 6,400 00 |
| Terminal facilities | 11,900 00 |
| Coal shutes, water stations, etc | 11,100 00 |
| Equipment | 81,900 00 |
| | $235,491 00 |

Cost per mile for 16 miles, $14,720.00.

These figures, and the detailed items that make them up, represent merely the engineer's opinion concerning the probable cost, and were in no sense binding upon Walker & Son. They did not undertake to do the work, and furnish the materials specified in the estimate, for the respective sums of money thus set down by the engineer; neither did they undertake the contract at the total cost for which Mr. Gleaves apparently thought that the road could be built and equipped. The parties did not agree in detail concerning the cost of the various items, but this subject was left entirely to the contractors' own judgment and calculation; and, so far as the total cost is concerned, it appears also that the engineer's estimate of $235,491 was not accepted by the contractors, but that they would not agree to do the work for a less sum than $277,-878—an increase of $42,387 over the estimate of Mr. Gleaves. The contract price, as is usual in such cases, was evidently arrived at by the bidder in his own way, was not separated into items by his bid, but was stated as a lump sum, which cannot, therefore, be distributed with

accuracy among the several branches of the work, by assigning so much to each item. For example, it is impossible to discover how much the contractors expected to spend upon the grading, or at how much they were willing to undertake it; how much upon the bridges; how much upon the terminal facilities, equipment, etc. This writing of September 13th was modified on October 20th, by a second agreement, of which the material terms are as follows:

"Whereas, by an agreement made between the parties hereto on the 13th day of September, in the year 1900, which is hereby reaffirmed and is to be taken and read as part of this agreement, the said Isaac A. Walker & Son did agree to construct a standard gauge railroad for the said party of the second part, as in said agreement specified, and to accept, in payment of two-thirds of the approximate contract price of $300,000, first mortgage bonds of the said company of an issue of $500,000 at 80 cents on the dollar, the said company attempting to float the residue of the bonds on its own account, and to pay one-third of the contract price aforesaid in cash within 10 days after the completion and acceptance of the work: And whereas the said company has been unable to get the said bonds subscribed for in the city of Norfolk, and has applied to the said contractors to take the whole of the said bond issue: Now this agreement witnesseth that for and in consideration of the premises and other valuable consideration, the said contractors do hereby covenant and agree to take the whole bond issue amounting to $500,000 at the price of 80 cents on the dollar, and the said contractors do further covenant and agree that, if they are able to dispose of said bonds at a larger price than that above named, they will pay over to the said company the amount of such increased price on $125,000 worth of said bonds reckoned at their par value. And the said contractors further covenant and agree that they will give bond with security approved by the said company conditioned for the faithful performance and completion of their contract, and commence work upon the same as soon as the bonds of the said company shall have been made, signed, secured by mortgage, and duly registered ready for delivery. It is also further mutually understood and agreed between the parties hereto:

"First. That the specifications of J. Taylor Gleaves, attached to the said contract bearing date on September 13, 1900, which is made a part hereof, are to be followed as closely as possible in the construction of the railroad, and only to be departed from when the requirements of construction render a change necessary, and in case of dispute as to the necessity of such changes, and as to the interpretation of the specifications of the contract, such dispute shall be decided by arbitration of the question at issue.

"Second. Before the work of construction under this contract is begun, a careful relocation of the lines shall be made, and detailed plans and profiles prepared of said location, showing the alignment, gradients, trestles, bridges, and other requirements of construction as determined in the said specifications; and details shall be fully set forth, and, before the work is begun, formally approved and agreed to by the contractors.

"Third. The line of the Chesapeake Transit Co. from Norfolk to Cape Henry, and any extension and branches thereof, shall be located by the engineer of the Chesapeake Transit Co., and he shall establish the alignment and gradients; and shall design or approve the designs for the bridges, structures, and appliances of whatever description. His approval and acceptance of all the work done by the contractors under this agreement shall be necessary before the same is accepted by the company."

The bond in suit, which was given on March 16, 1901, refers to the agreements of September 13th and October 20th, and guarantees their faithful performance by the contractors. By the terms of the first contract, then, the contractors were: (a) To build and equip a standard gauge railroad to be operated by steam, the line to be at least 16 miles long; the company to have the option to extend the line to 20 miles,

and also to extend it over a still greater distance to a point not specified, the location of any extension to be made by the company's engineer. (b) To follow closely the specifications of Mr. Gleaves, who was to superintend and approve all work done under the contract. (c) To finish the work within five months. And for carrying out this contract they were to receive $20,000 of the capital stock of the company—which was then $100,000—full paid and nonassessable, and $500,000 of the first-mortgage bonds of the company valued at 80 cents on the dollar; the contractors agreeing that, if they should sell the bonds at a higher price, they would pay over to the company "the amount of such increased price on $125,000 worth of said bonds, reckoned at their par value."

This is the contract for which the defendant became surety, and for its breach the present suit is brought. After the bond was executed, various steps were taken by the company toward securing rights of way, and making other preliminary arrangements, and several months were spent in this work, and in correspondence and interviews. In the end, it appeared that the contractors could not carry out their engagement, and on October 28, 1901, before they had entered upon the task of construction, they were formally notified that the company would take other means to have the road built at once, and would hold them liable in damages. Negotiations between the company and other persons followed, the result being that a new contract was made with the National Construction Company, on January 20, 1902, under which the road was built. As the terms of this agreement differ from the terms of the foregoing contract with Walker & Son, it is necessary to determine whether the differences are so important that the surety has been relieved from liability. To take an extreme case, which was used as an illustration at the trial, if the company, after the breach of the first contract, had abandoned the land route between Norfolk and Cape Henry, and had decided to connect these terminal points by a line of steamers on Chesapeake Bay, clearly the surety would have had no concern with the second enterprise, and could not have been held liable if its cost had been greater than the cost of the railroad. At the other extreme, if a contractor had been found to sign a precise duplicate of the agreement with Walker & Son—with the single difference that the price was higher—the surety could have had no defense to a suit for the increased cost under the second contract. The present situation lies between these two extremes, and, as I have already said, requires an examination of the differences between the two contracts, and a determination whether the undeniable changes are material and substantial.

The second contract (which is a much more elaborate document than the first, and is too long to be quoted) requires the National Construction Company, inter alia: (a) To build and equip a railroad to be operated by both steam and electricity, from Norfolk to Cape Henry and thence to Virginia Beach, a distance of about 23 miles, the line to be run upon the right of way as then located. (b) To follow the specifications annexed to the contract, the work to be supervised and approved by the company's engineer. (c) To begin the work within 10

days, and to have the road in commercial operation within four months from January 20th.

In consideration of the construction company's engagements, the transit company agreed to pay $495,000 in first-mortgage bonds, face value, of an issue of $500,000, and to deliver $400,000 of the capital stock of the company—which was now $500,000—full paid and non-assessable.

There are many other provisions in the second contract that do not appear in the first, and some of them are much more than mere matters of detail, as a careful reading will disclose; but I do not think it necessary to lay stress upon any other differences than those already specified, for, in my opinion, these are so marked and so material that the two agreements cannot be properly said to be substantially identical. One road was to be built and equipped as a steam road, the other as a road to be operated by both steam and electricity; the specifications of the first contract (so far as they may be divined from the estimate of Mr. Gleaves) differed in many and important respects from the specifications of the second contract; the time allowed for completing the work differs by a month; and, finally, the method and means of payment differ so much in their terms as to be hard to compare with accuracy. Clearly, all these differences must have had their influence upon the respective bids of Walker & Son, and of the National Construction Company, and, in my opinion, the changes that appear in the second contract are so numerous and so vital as to forbid the conclusion that the two agreements differ only in unimportant particulars. I believe them to be distinct contracts, differing so much in scope and in terms that the second cannot be held to be an immaterial variation from the first; and I therefore hold that the liability of the surety upon the first agreement has been discharged, because it cannot be measured, either legally or equitably, by what was done under the second.

And the conclusion would be the same, if another test should be applied. Suppose Walker & Son had begun to build the road under the first contract, and during the progress of the work they had agreed with the transit company to the various changes that are embodied in the second contract. In such an event, it seems to me that the surety would inevitably have been discharged from liability, because the changes were material, and were made without his consent. If this be true, I cannot see how the application of the rule is to be avoided, by putting the changes into a new agreement, made with a stranger to the earlier contract.

But there is a further reason for denying the plaintiff's right to recover, namely, that the evidence offered in support of the right was not definite enough to enable the damage to be ascertained. The plaintiff was well aware that the two contracts, each taken as a whole, were not capable of comparison, and, accordingly, recovery was sought for the increased cost of one item only—an item that was necessarily common to both contracts, namely, the cost of the permanent way, including, in that phrase, grading, ties, rails, bridges, and the like. But no effort was made to prove the difference by the best and most direct method—that is, by proving for what price Walker & Son had agreed

to do this work, if such price could be satisfactorily discovered, and then by proving what the work actually cost, as it was done upon the ground by the National Construction Company. The method adopted was to take the contract price under the second agreement, attempt to reduce it to a cash basis, deduct therefrom the estimate of certain witnesses concerning the fair value (but not the actual cost, so far as appears) of the work and material that were peculiar to the second contract, and assume the remainder to be the actual cost of the permanent way. This remainder was then compared with the engineer's estimate of what the same cost would probably have been under the Walker contract, and the difference was put forward as the plaintiff's actual loss. Many complications and uncertainties of detail, which I shall not take time to specify, are involved in this method of calculation, but, even as just stated, I think it is manifest that the method is largely conjectural, and could not safely be relied upon to produce a result even approximately correct. And when, to the difficulties thus appearing, are added the difficulties arising from the numerous changes in detail between the two contracts, it becomes impossible, I think, to reach a conclusion that is even fairly satisfactory. If I may judge by my own experience, no one can read the evidence without being bewildered by the effort to make the frequent allowances and assumptions that must be made in order to follow the plaintiff's calculation, and without believing that this difficulty furnishes the probable reason why no agreement upon a verdict could be reached. If the case were now before me without a jury I should find it impossible to reach a conclusion that I could defend by specifying the particular pages of the testimony upon which I relied.

Being still of opinion, therefore, that the direction to find a verdict in favor of the defendant was right, the motion for a new trial is refused.