**UNITED STATES v. 13.40 ACRES OF LAND IN CITY OF RICHMOND, CONTRA COSTA COUNTY, CAL., et al.**

No. 22764–G.

District Court, N. D. California, S. D.

July 15, 1944.

M. Mitchell Bourquin, of San Francisco, Cal., for plaintiff.

Heller, Ehrman, White & McAuliffe, of San Francisco, Cal., for defendants J. Philip Murphy, C. Dudley DeVelbiss, and Y. C. Soda.

GOODMAN, District Judge.

The United States filed a complaint to condemn the fee title of approximately 13.40 acres of land in the City of Richmond, County of Contra Costa, State of California, commonly known and designated as "Easter Hill," and containing rock material suitable for building and construction uses, naming the defendants C. Dudley DeVelbiss, J. Philip Murphy and Y. C. Soda, as owners of the property.

The owner defendants, by answer, alleged the fair market value of the land to be the sum of $600,000, and, in addition, prayed for the sum of $43,436 special damages. Defendants City of Richmond and American Trust Company also answered, but the issues raised in such answers were not tried and are not involved in the question before the Court. The complaint alleged that the land was acquired for the use of the United States Maritime Commission in connection with the construction of shipyards. Prior to trial, plaintiff sought to amend the complaint to limit the interest sought to be taken to a designated quantity of the rock material contained in the premises. Subsequently, however, the motion to amend was abandoned and the cause went to trial before a jury upon the issue of the proper compensation to be awarded defendant owners for the fee title to the land. Upon the trial, evidence was introduced by the government in support of its contention that the fair market value of the property as of September 15, 1943, (the date of taking) did not exceed approximately $55,000; whereas defendants introduced testimony to substantiate their claim that the fair market value of the property was in excess of $600,000. The jury returned a verdict fixing the damages in the sum of $306,000. Plaintiff has moved for a new trial principally on the ground that the evidence was insufficient to justify the verdict and that the verdict was against law.

"Easter Hill" consisted, at the time of taking, of a number of lots comprising a total area of approximately 13.40 acres located in the City of Richmond and adjacent to shipyards then in the course of construction and operation by the United States Maritime Commission.

More than two years prior to the commencement of the action, defendants began acquiring, by purchase, certain of the lots included in the 13.40 acres, and, finally, after a period of time, succeeded in obtaining ownership of all of the lots condemned at a total cost of approximately $35,000. The parcel as a whole had been known in the Richmond community for many years as "Easter Hill" and had never been de-

veloped for residential purposes, although streets were laid out over and upon the hill; it had mainly been used by sightseers as a point from which to view the surrounding community and for Easter morning religious services.

Defendants had been excavating rock material from the "Hill" for some time and had secured permission from the City of Richmond to reduce the level of certain of the streets to the extent of 50 feet and to remove and dispose of the rock material so excavated from beneath the street levels. Prior to the commencement of the action, the Maritime Commission had been purchasing quantities of the rock material from the defendants and using the same in connection with construction work at the adjacent shipyards. At the time of the commencement of the action, defendants were lowering the level of other streets and removing the rock material, although formal permission from the City Council of the City of Richmond had not been obtained therefor. For reasons not fully disclosed by the evidence, the Maritime Commission discontinued purchasing rock material from the defendants and instituted this action. Equipment of various kinds was used by the defendants to blast out and remove the rock material. After the taking, the Maritime Commission continued the same type of operations in removing the rock material and making use of it for its purposes in connection with the shipyard construction work.

On motion for new trial, the government contends that the evidence is wholly insufficient to sustain the verdict. Its claim is that the testimony of defendants' expert witnesses clearly indicates that their opinions were based in whole, or substantially in whole, upon conjecture and speculation, namely, an evaluation of profits to be derived in the future from quarrying operations on the land.

In opposition, defendants contend that the factors relied upon by their appraisal experts were proper, and not conjectural or speculative, that such testimony went into the record without objection and that plaintiff introduced the same type of evidence and therefore cannot now be heard to object.

Preliminarily, the Court must consider the extent of its power in passing upon a motion for new trial in a condemnation proceeding.

■ Plaintiff's motion for a new trial designates a number of the grounds provided for in Section 657 of the California Code of Civil Procedure. While this Court is bound to follow "the practice, pleadings, forms and modes of proceedings" in condemnation proceedings, existing at the time in state courts of record, as provided in the "Conformity Statute," 40 U.S.C.A. § 258, the right to a new trial is not procedural, but is a matter of substance. See: Slocum v. New York Life Ins. Co., 228 U.S. 364, 33 S.Ct. 523, 57 L.Ed. 879, Ann.Cas.1914D, 1029. It may therefore be properly said that, while "the practice, pleadings, forms and modes of proceedings" appertaining to motions for new trial in the Federal Courts in condemnation proceedings should follow like forms in the state courts, nevertheless, the granting or denial of a new trial goes to substance and not to form.

■ Plaintiff's notice of intention to move for new trial was filed April 21, 1944. The motion was argued to the Court on May 19, 1944, and on that date submitted upon the later filing by both sides of written briefs. On or about June 20, 1944, the last brief having been filed, counsel called the court's attention to Sec. 660 of the California Code of Civil Procedure, which provides that "the power of the court to pass on motion for a new trial shall expire sixty (60) days from and after * * * filing of the notice of intention to move for a new trial." Sec. 660 further provides that non-determination of the motion within the sixty (60) day period shall be deemed a denial thereof. No authorities have been submitted, nor have any been found by us, which consider the question of whether this court is bound by the foregoing code section. However, Section 660 is not procedural in the sense contemplated by 40 U.S.C.A. § 258. Section 660 limits the power and jurisdiction of the state courts on motions for new trials in all cases and no doubt was enacted to expedite determination of causes in the state courts for reasons deemed necessary or proper by the State Legislature. No such limitation of power exists in the federal courts. Furthermore, as already pointed out, the granting or denial of a new trial is substantive, not procedural. Slocum v. New York Life Ins. Co., supra. Being satisfied that this is not a "procedural" matter, I do not feel bound by Section 660 of the California Code of Civil Procedure.

■ That the verdict is merely against the preponderance of the evidence or that the court itself might have arrived at a different result, are not, by persuasive authority, sufficient grounds for the granting of a new trial. Stentor Electric Mfg. Co. v. Klaxon Co., D.C., 30 F.Supp. 425; Chesevski v. Strawbridge & Clothier, D.C., 25 F.Supp. 325; Weed v. Lyons Petroleum Co., D.C., 294 F. 725; 20 R.C.L. 274.

■ The verdict may be set aside, however, if the Court is satisfied that the evidence as a whole, after according to it the highest probative force to which it is lawfully entitled, is insufficient to support the verdict. Maryland Casualty Co. v. Reid, 5 Cir., 76 F.2d 30; Pleasants v. Fant, 22 Wall. 116, 120, 22 L.Ed. 780; Southern Pac. Co. v. Hamilton, 9 Cir., 54 F. 468.

To the jury in this case was committed the determination of the market value, fairly determined, of defendants' land at the date of taking. The jury was instructed as to the meaning of market value according to the principles enunciated in United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L. Ed. 336, 147 A.L.R. 55, and Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236.

■ Actual sales could not be used as a basis for ascertainment of market value of the land and hence the testimony of so-called expert appraisers was presented to support defendants' claimed valuation. Washington Water Power Co. v. United States, 9 Cir., 135 F.2d 541.

Defendants supported their claim of valuation by the testimony of two expert appraisers—Walter N. Gabriel and F. Bruce Maiden. Mr. Gabriel appraised the fair market value of the land at $622,725.00 and Mr. Maiden appraised it at $687,000. The government produced two expert appraisers —George H. Canfield and George Thomas. Mr. Canfield testified that in his opinion the market value of the land at the time of taking was $55,050, and Mr. Thomas' opinion was $45,000.

■ Both Mr. Maiden and Mr. Gabriel were men of wide experience in real estate appraisal and of excellent standing and reputation. The same may be said of Mr. Canfield and particularly of Mr. Thomas, whose experience and services on behalf of both governmental agencies and private enterprise, were perhaps greater than the other three. All the more startling and extraordinary, therefore, is the extreme divergence of appraisements—$45,000 as against $685,000. It cannot be explained by either conservatism on the one hand or, perhaps, over-enthusiasm on the other hand. It is perfectly clear that the standard or yard stick of appraisement applied by defendants' experts affords the only reasonable explanation. The record clearly discloses that both of the expert witnesses produced by defendants (upon whom rested the onus of proof) based their estimates of market value of this land upon data and factors of a speculative and conjectural nature, which cannot, under well established principles, be taken into account in the determination of market value. Both Mr. Gabriel and Mr. Maiden appraised the land upon the basis of returns inuring to the defendants out of future sales of the rock material. Both made inquiries and investigations with respect to the production, transportation and sale of rock material. Predicated thereon, they estimated the selling price in the future of the rock material and then made deductions by way of expenses for blasting, trucking, general operating expenses, allowance for risks and other unforeseen business contingencies and then, upon that concept, proffered their opinions as to the market value of the property. *What they really did was to appraise the present value of the anticipated profits from the sale of the rock material and not the market value of the land itself as of the date of the taking.* Such a modus of evaluation is not according to proper standards or criteria legally approved in the determination of market value.

■ The separate valuation of timber or rock attached to land, or valuations arrived at by a process of multiplying the number of cubic feet or yards by a given price per unit, are not approved bases for evaluation. United States v. Indian Creek Marble Co., D.C., 40 F.Supp. 811.

"Fixing just compensation for land taken by multiplying the number of cubic feet or yards or tons by a given price per unit has met with almost uniform disapproval of the courts. This is true because such valuation involves all of the unknown and uncertain elements which enter into the operation of the business of producing and marketing the product. It assumes not only the existence, but the continued existence of a stable demand at a stable price. It assumes a stable production cost and eliminates the risks all business men know attend the steps essential to the conduct of a man-

ufacturing enterprise. It eliminates the possible competition of better materials of the same general description and of the possible substitution of other and more desirable materials produced or possible of production by man's ingenuity, even to the extent of rendering the involved material unmarketable. It involves the assumption that human intelligence and business capacity are negligible elements in the successful conduct of business. It would require the enumeration of every cause of business disaster to point out the fallacy of using this method of arriving at just compensation. No man of business experience would buy property on that theory of value. True it is that quality and quantity have a place in the mind of the buyer and the seller, but the product of these multiplied by a price per unit should be rejected as indicating market value when the willing seller meets the willing buyer, assuming both to be intelligent. Values fixed by witnesses on such a basis are practically worthless, and should not be accepted. *To the extent the valuation fixed by any witness contains this speculative element, to the same extent is its value as evidence reduced."* (Emphasis supplied.) United States v. Indian Creek Marble Co., supra, 40 F.Supp. at page 822; United States v. Meyer, 7 Cir., 113 F.2d 387; United States v. Rayno, 2 Cir., 136 F.2d 376; United States v. 5 Acres of Land, etc., D.C., 50 F.Supp. 69; United States v. Certain Lands Located in the Towns of, etc., D.C., 52 F. Supp. 314.

The appraisement of defendants' experts was, in effect, a valuation of defendants' so-called rock material business. Such also was improper. Mitchell v. United States, 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644.

In United States v. 5 Acres of Land, supra, the Court said, 50 F.Supp. at page 71:

"Edwards, the only real estate expert called by the defendant, predicated his opinion of value entirely upon profit factors of the sand and gravel, and not upon sales of similar properties containing sand and gravel deposits which have been made in the vicinity in past years, and I reject such, as based upon an improper method."

In United States v. Meyer, supra, the Court appropriately stated the rule as follows, 113 F.2d at page 397:

"The insistence that the court erred in excluding evidence in regard to money value of past or future profits is ill founded. The material question was the fair cash market value of the land. Past profits and probable future profits are too conjectural to furnish *any* basis for determination of value." (Emphasis supplied.)

■ The following excerpts from the testimony of Mr. Gabriel and Mr. Maiden clearly demonstrate that they predicated their opinions upon improper bases:

"Q. What is he going to get for the material that he disposes of in from one to four or five years? A. He probably would get up to two million dollars.

"Q. Two million dollars. That is based on, you say, the quantity you gave of 689,-738 cubic yards at what price? A. You would have to take into consideration a probability of a certain portion being—

"Q. What price? A. I am trying to answer your question.

"Q. Price calls for a figure. A. I am going to come to them—the portion of the rock at one price and a portion at another.

"Q. What price? A. One estimate would be that probable revenue would be for about 180,000 yards of class A material which I estimate to have a market price of around $4.55 a yard, and the remainder class B material would have a market price of around $2.66 a yard." Testimony of Mr. Gabriel, Trans. page, 369.

"Mr. Foley: Q. That was not quite the question. You said you would consider the possibility of being able to remove certain material. What possibility, or to what extent did you consider it? A. Well, to the extent of this—here was a situation of a large body of land with a unity of use, practically 100 per cent unity of ownership, and the process going on of reducing the hill, producing valuable rock therefrom, and in the measure of prices of rock elsewhere by the comparison you could estimate a revenue that might be produced from the hill as a whole; you could project a probable figure, a possible figure that that hill would produce as a revenue, and weighing all of the factors of risks, probabilities, you could arrive at—and by measurement either by lots or by a proportion of one number of lots in one area to the total number of lots, or by taking the relationship of the square foot area of one parcel there to the whole, or by a measurement of cubical content, some fair approach could be made to the distribution of that income to the several parcels, and you weigh all of the factors which influence that to estimate a

540

market value of the parcel. That is the process that my mind goes through." Testimony of Mr. Gabriel, Trans. pages 364, 365.

"Then I made a study of using the entire rock for Class B rock, and I took the price of $1.40 a ton in the truck, which was my composite judgment from talking to all quarrymen in Oakland. I took for shooting 10 cents, I took for loading 10 cents—that is 20 cents—and I got $1.20 per ton. I multiplied that by 2.2 to reduce it to yards, and I got $2.66 per cubic yard.

"My next study was on Class A rock. My opinion, after talking to all the quarrymen, was that a reasonable price for Class A rock was $2.50 a ton in the truck, in the barge or in the car; shooting of that rock was 20 cents, loading 25 cents a ton, total 45 cents, leaving $2.05 to be multiplied by 2.2 to reduce it to cubic yards. That came to $4.55. Now, that was the base of my calculations in arriving at the unit that I would apply to the next point." Testimony of Mr. Maiden, Trans. page 400.

"Then I took each of these items, like the crusher run rock, which was $1,144,965, and I made discounts for risks, I made a discount for volume of 20 per cent. I assumed there would be 20 per cent less rock there than the engineer had estimated. I took 15 per cent for a change in price. I took that smaller because the price on crusher run rock is very fine; it is more like selling a Stetson hat; there is a constant market for it and the variation is small. Then I put 5 per cent for management. That gave me a total of 30 per cent. 30 per cent of $1,144,965, which is $343,489. So I deducted that sum, and that left me $801,476, which is what I would have left after taking off those risks." Testimony of Mr. Maiden, Trans. pages 401 and 402.

" * * * The difference between the revenue of the parcels and the market value of the parcels is roughly $400,000. So the man buying them for $687,000 would have a profit of approximately $400,000, which would include his taxes, his carrying charges, and whatever element of time was present until he realized it, and that, after a discount in these other fashions, of the 45 per cent in Class A and B, 40 per cent on B and 30 per cent on crusher run, so that, for example, A and B, which started at $2,174,000 a buyer would acquire that at $687,700, he would acquire what started as two million, or he would be paying about a third. He would be paying about a third for the total amount that was in there. Those are the discounts and elements that I took into consideration, that I thought would produce a buyer in the market who did not have to buy from a seller who did not have to sell." Testimony of Mr. Maiden, Trans. pages 404 and 405.

The Court, in instructing the jury to disregard speculative or conjectural matters, said: "Future income or speculative productive value contemplated is not a measure of compensation. Profits which might be derived from devoting land to a particular purpose depend so much on conditions that cannot be foreseen that they have no competency." (No exceptions to the court's charge were taken.)

That the jury, nevertheless, did enter this forbidden field is evidenced by the following incident, which occurred while the jury was deliberating: A request was received by the Court from the jury room reading: "We require Mr. Hussey's figures of cubical content excluding certain lots not owned by the defendants." By consent of counsel, the Court read the following figures from the record to the jury: "680,732 cubic yards." The verdict of $306,000 appears to have been arrived at by multiplying the cubical content by a price of 45¢ per cubic yard.

The testimony of the defendants' appraisers was wholly insufficient in law to sustain the verdict and I find it my clear duty, in the interests of justice, to so hold.

Defendants, while not admitting the insufficiency of their own experts' testimony, assert that plaintiff's expert witnesses proceeded along the same lines in arriving at their determination of value. Be that as it may, if the testimony offered on behalf of the defendants, upon whom rested the burden of proof is insufficient as a matter of law, it is immaterial that the plaintiff erred in like manner, if it did so err.

It is also contended by the defendants that, granted the insufficiency of the defendants' expert testimony, nevertheless it went in without objection in any form and both sides submitted the cause to the jury without raising any question as to the legal sufficiency of the evidence.

The contention is not meritorious. The evidence being insufficient in law, the infirmity is not cured by silence. If at any stage of the proceeding, the invalidity of the evidence appears, the Court is bound

in the interests of justice to so treat it. Goehrig v. Stryker, C.C., 174 F. 897, at page 904; Harding v. Robinson, 175 Cal. 534, 540, 166 P. 808; Chesapeake Transit Co. v. Walker & Son, C.C., 158 F. 850; American Coal Briquetting Co. v. Minneapolis, St. P. & S. S. M. R. Co., 41 N.D. 381, 170 N.W. 568, 570.

Furthermore, "At common law and by statute, the federal District Judge is charged with the duty of granting a new trial in a jury case where, in his opinion, it went unjustly and injuriously out of bounds." Maryland Casualty Co. v. Reid, supra, 76 F.2d at page 33. 28 U.S.C.A. § 391.

The motion for new trial is granted.