UNITED STATES v. 37.15 ACRES OF
LAND, MORE OR LESS, IN MARI-
POSA COUNTY, CAL., et al.

No. 23275.

District Court, D. California, S. D.

March 31, 1948.

On Allowance of Interest May 12, 1948.

M. Mitchell Bourquin, Sp. Asst. to the Atty. Gen., and John E. Lynch and Francis Foley, Sp. Attys., both of San Francisco, Cal., for plaintiff.

Maurice E. Harrison and Brobeck, Phleger & Harrison, all of San Francisco, Cal., for defendant Yosemite Park and Curry Co.

GOODMAN, District Judge.

Yosemite National Park (16 U.S.C.A. § 46) is one of the most outstanding and unique National Parks and landmarks dedicated by the Congress to the public domain. It lies in the valley of the upper Merced River amidst the Sierra Nevada Mountains of California. Many thousands of tourists from all over the world visit the park annually. It is about eighty-five miles from Merced, California and may be reached by excellent all year round paved highways.

Since 1926, by agreements and extensions of agreements with the United States, the defendant, Yosemite Park and Curry Co., a California corporation, has established in the valley and maintained and operated hotels, camps, facilities for skating, sleighing and other winter sports, places of amusement, stores, motor and other forms of transportation, theatres, shops, stables, garages and also similar facilities and establishments for the housing, feeding, sight-seeing and amusement of visitors to the Valley.

Presently the United States and the defendant corporation are governed by a contract of October 1, 1932 still in effect. By this agreement the defendant pays to the United States by way of rental, a fixed sum per annum plus a percentage of the net proceeds of its operations.

In 1926-1927 the defendant corporation erected in the valley the Ahwahnee Hotel, a Class A hotel, having, in addition to guest sleeping rooms, several large and distinguished public lounges of unquestioned beauty and uniqueness of decorative motif. Subsequently the defendant corporation developed wild flower gardens and constructed tennis courts, cottages and landscape improvements about the hotel proper.

The United States filed its complaint in condemnation in this court on April 28, 1944 and on the same day the Secretary of the Navy by declaration of taking, took the Ahwahnee Hotel and surrounding acreage, totalling 37.15 acres together with the improvements, for the purpose of therein conducting a naval convalescent hospital for a term beginning June 7, 1943 and ending June 30, 1944. At the same time the Secretary of the Navy deposited in the registry of the court the sum of $58,913.00 which amount he estimated to be the value of the interest taken. On October 13, 1944, the Secretary of the Navy filed a second declaration of taking wherein he took the same property for a term commencing July

1, 1944 and ending June 30, 1945 and simultaneously deposited in the registry of the court the sum of $55,812.00 which he estimated to be value of the interest taken. By amendment to the complaint filed June 27, 1944, the United States alleged that the term taken was for a period commencing June 7, 1943 and ending June 30, 1945; by a second amendment filed June 27, 1945, the United States alleged the taking to be for a term beginning June 7, 1943 and ending June 30, 1946. Possession by the United States was from June 7, 1943 to June 30, 1946.

Upon taking possession, the government made certain structural changes in the hotel, which it regarded as necessary for a convalescent hospital. It retained on the premises and used certain of the furniture and furnishings. The remainder was stored with a storage company in Oakland, California. It erected a number of temporary structures in the garden and landscaped portions of the grounds. As a result of the erection of these structures and because of lack of upkeep during the government's occupancy, substantial damage was done to wild flower and other gardens and to a miniature golf course maintained by defendant.

After the cause was at issue the parties voluntarily appeared for a pre-trial conference, and, by agreement, submitted to the court the question as to the time at which the value of the terms taken should be fixed. The court made a pre-trial order on November 26, 1947, directing that the value of the term commencing June 7, 1943 and ending June 30, 1944 should be fixed as of June 7, 1943; and that in like manner the value of each of the two succeeding terms of one year each should be fixed as of the date of the beginning of each of such one year terms. The United States was allowed an exception to this order. Later the defendant corporation was permitted by amendment to its answer to set up its claim for alleged damage to both real and personal property during government occupancy.

Trial by jury was waived. There was submitted to the court for determination:

1. The rental value of the terms taken; and

2. The amount of damage to real and personal property of the defendant corporation during the government occupancy.

Real estate and other experts testified at the trial on both sides. The court, with the prior specific consent of both parties, and on January 2, 1948, informally visited and inspected the hotel and surrounding area. The trial consumed six days (Transcript 743 pages; 27 detailed schedules and exhibits.)

Rental Value of Terms Taken.

Upon the issue of the market value of the interest taken, for the plaintiff, the witness Mead fixed the rental value at the sum of $64,800.00 for each of the three terms.

The witness Goldstein fixed the value of the terms as follows:

| | |
|---|---|
| For the first term | $46,380.00 |
| For the second term | 43,500.00 |
| For the third term | 52,000.00 |

The witness Goldstein's evaluation was the same for both first and second terms, but the difference in the amount is due to the first term being longer by twenty-three days than the second term.

For the defendant corporation, the witness Babcock evaluated the

| | |
|---|---|
| First term at | $ 91,000.00 |
| Second term | 97,000.00 |
| Third term | 109,000.00 |

The witness Maschall evaluated the

| | |
|---|---|
| First term at | $106,000.00 |
| Second term | 108,000.00 |
| Third term | 120,000.00 |

The witness Thompson evaluated the

| | |
|---|---|
| First term at | $130,000.00 |
| Second term | 140,000.00 |
| Third term | 140,000.00 |

All of the evaluations on both sides were upon the basis of what a willing renter, i. e. hotel operator, would pay per annum for the Hotel Ahwahnee fully equipped and furnished as it was at the time of the taking in complete operating condition as a hotel with its surrounding grounds and installations.

The expert witnesses on both sides testified that they took into account conditions in the hotel and resort business at the beginning of each of the terms, the

location of the Ahwahnee Hotel, its furnishings and equipment, its prior history of earnings as an operating hotel and other like factors.

Included in the witness Mead's evaluation were certain items of so-called severance damage, i. e. loss of income to the defendant corporation in its other operations due to the taking of the Ahwahnee Hotel, amounting to a total sum of $20,000.-00. Consequently the estimate of rental value of this witness was reasonably close to the figure of the witness Goldstein.

 Thus the lowest appraisal of defendant's witness is approximately twice that of the government experts. The government witnesses fixed the rental value at a figure even lower than the amount deposited by the United States in the registry of the court at the time of filing the declaration of taking. From the whole picture of this case, as disclosed by the evidence, I cannot help but conclude that there is an excess minimization of values on the one side and over enthusiasm on the other—a phenomenon not untypical of condemnation cases. See United States v. 13.40 Acres of Land in City of Richmond, D.C., 56 F.Supp. 535; United States v. 711.57 Acres of Land in Eden Township, D.C., 51 F.Supp. 30. Consequently I must consider not only the "guess[es] by informed persons" (United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 280, 87 L.Ed. 336, 147 A.L.R. 55) but also all other properly relevant factors, in fixing damage. I am satisfied from the evidence that at the time of taking there had already begun a period wherein the demand for hotel and resort accommodations exceeded the supply. Consequently it would not be fair to give controlling weight to the record of earnings of the Ahwahnee Hotel during the years of operation immediately preceding the taking. The contention of the government that the already increasing demand for hotel and resort accommodations would not affect the Ahwahnee Hotel because of its location in the Yosemite Valley, is not persuasive inasmuch as it rests upon speculation and conjecture and appears to be at variance with general observation.[1] The witnesses on both sides, except the witness Mead, fixed a higher rental value for the second and third terms,[2] thus indicating the correctness of the view that the hotel and resort business generally was progressively increasing during the period of the government's occupancy. Having in mind all of the relevant factors including my visit to and inspection of the property, its environs and accessibility, I fixed the rental value of the terms as follows:

First term—at the rate of $6,000.00 per month or a total sum of $ 76,600.00

Second term—at the rate of $7,000.00 per month or a total sum of 84,000.00

Third term—at the rate of $8,000.00 per month or a total sum of 96,000.00

Total rental value $256,600.00

### Restoration of Hotel and Cottages.

 The testimony shows that the defendant was required to completely re-stucco all bedrooms and to re-varnish and repair woodwork and certain portions of the plaster; also to do the carpentry work necessary to remedy the structural changes made, to replace and repair plumbing, heating and refrigeration equipment, tile floors, glass and glazing and various items of builder's hardware and similar items. The defendant contracted out the doing of this work and the total amount which it paid out was the sum of $93,132.64. Included in this amount was an item of architects fees amounting to 7,583.88

$85,548.76

paid to Mr. Spencer, who had been the consulting architect for the hotel since its construction in 1927, and to his wife. I am satisfied that the evidence is not

---

[1] See Galvin v. Southern Hotel Corp., 4 Cir., 164 F.2d 791, at page 792.

[2] Witness Goldstein fixed a higher value for the third term than for the first two terms.

sufficient to justify the allowance of architect's fees as part of the cost of restoration. Under all of the circumstances the necessity for such services is not shown by the evidence. The evidence shows that the services rendered by Mr. and Mrs. Spencer were of a general supervisory character such as any owner would ordinarily perform in connection with repair work of this nature. No plans or designs, such as are prepared in connection with new building or reconstruction, were required. Any reasonably skilled workman could do the work of repair, under contractor's direction, without the need of an "architect."

There is nothing to indicate to the court that the actual cost of restoration of the hotel and cottages was not the reasonable value thereof. Consequently the sum of $85,548.76 for the restoration of the hotel and cottages is allowed.

### Restoration of Gardens [3] and Miniature Golf Course.

The evidence showed that the defendant actually expended $14,692.73 to restore the surrounding gardens and golf course to the condition existing at the time of taking. The government witnesses estimated the cost of doing this work to be approximately 40% of the actual amount expended by the defendant. However this was but an estimate and does not persuade the court that the actual cost as shown by the evidence was not reasonable under the circumstances. Therefore the sum of $14,-692.73 is allowed as damages to the gardens and golf course.

### Restoration and Replacement of Equipment and Furniture Used by the Government.

Detailed testimony showed that the defendant expended the sum of $62,-327.88 to restore and replace equipment and furniture damaged or destroyed by the government during the occupancy. Included in this amount was the sum of $1,334.71 for architect's fees, which is disallowed for the reasons hereinbefore stated, leaving the net cost of restoration $60,993.17. Here again government witnesses estimated the cost of this work at figures approximately 40% of the actual cost. Here again nothing indicates that the actual amounts expended by the defendant were not reasonable. It is pertinent to comment that the government did not itself (as was its obligation as lessee) restore or rehabilitate either the building or the furniture or equipment. This the government could have done and thereby have closed the question of cost. The court would not have then been called upon to fix damage. The difficulty of fixing the damages therefore may properly be said to result from the government's election. Difficulty in fixing damages does not prevent allowance of damages. In such event the court must adopt the most reasonable basis under the circumstances. See Defense Supplies Corp. v. Lawrence Warehouse, Co., D.C., 67 F. Supp. 16 and cases there cited. Affirmed 9 Cir., 164 F.2d 773. For the damage to the equipment and furniture the sum of $60,993.17 is allowed:

### Deprivation of Use of Property from Date of Return of Property to Defendant to Date of Opening of the Hotel.

It is not, and clearly could not be, disputed that the United States was obligated to return the hotel together with its equipment and furnishings, to the owner upon the termination of the term, in as good a condition as when received, reasonable wear and tear thereof excepted. Until the United States did so return the property, both real and personal, in such condition it, of course, was liable for the fair market value of the use of the property since the taking had not yet terminated. Consequently it is logical to say that had that been done, the Ahwahnee Hotel would have been in condition for its owners to then resume hotel operations on the premises. However, the government elected not to restore the premises, repair the damage caused to real and personal property lost or destroyed, but left that to be done by the owners. Therefore it would follow that the United States is liable for the reasonable cost of restoring the premises

---

[3] This is a different item than the "wild flower garden" referred to infra.

and personal property and also for the reasonable value of the use of the premises during the period of time required to accomplish such restoration. The reasonable rental value of the premises during the period of restoration would not then be consequential damages not compensable under applicable condemnation law, but it is the very amount that the government would have been required to pay in any event during the time that it would have taken the government to have repaired and restored the premises, their furnishings and equipment.

It could be contended, although the point is not specifically made by the government, that such damages are consequential because they, in a strict sense, arise by virtue of the interruption by the condemnation of the hotel operations.[4] However, since the damage directly and proximately resulted from a breach of the obligation of the government as lessee, the result is not due to an interruption in business.[5] For the deprivation of use of the hotel from July 1, 1946 to December 19, 1946 (i. e. the period between the surrender of possession by the government and the reopening of the hotel) I fix the damage at $45,067.00 (being at a rental value of $96,000.00 per annum).

### Opening and Closing Expense.

The evidence shows that the defendant expended money in closing and terminating hotel operations at the time of the taking and likewise in the period following surrender of possession by the government to prepare for the resumption of such operations. These expenditures in the main were for labor, supplies, utilities, clerical and accounting services. They amounted to $1,396.68 for closing expenses; and $35,799.18 for opening expenses.

Defendant seeks reimbursement of these amounts as a direct damage, citing United States v. General Motors Corporation supra, as authority. However defendant admits (and quite correctly) that these expenses "were caused solely by the interruption of the hotel operations by the government seizure" (Reply Memorandum of defendant, page 6). General Motors, supra, however, does not overrule Mitchell v. United States, 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644; or Joslin Manufacturing Co. v. Providence, 262 U.S. 668, 675, 43 S.Ct. 684, 67 L.Ed. 1167. Nor does it hold in favor of the allowance of consequential damages occasioned in the conduct of a business enterprise and not affecting the res itself. See also United States v. 13.40 Acres of Land in City of Richmond, D.C., 56 F.Supp. 535. The items of damages claimed for opening and closing expenses are therefore disallowed.

### Damages Sustained and not Repaired.

The defendant contends that government occupancy caused certain damages to the hotel which were not repaired. These items had to do with (a) stucco walls; (b) bath tubs, tile and other bathroom fixtures; (c) decorative wall stencils. Considerable evidence was presented by the defendant on these subjects.

(a) Stucco walls. The evidence revealed no controversy as to the approximate cost of re-stuccoing the interior walls. They were painted. But defendant claims that, after deducting the cost of repainting from the portion of the cost of re-stuccoing chargeable to the government, unrepaired damages amounting to $12,163.00 should be allowed.

(b) Damage to tubs, tile and bathroom fixtures. The evidence showed that some of the bathroom fixtures were rendered useless; some of the tubs were damaged beyond the effects of reasonable wear and tear; medicine cabinets were damaged and repainted and substantial damage was done to tile and door stops. None of the alleged damage to bath room fixtures and tiling was repaired by the defendant, except such

---

4 Mitchell v. United States, 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644; Joslin Manufacturing Co. v. Providence, 262 U. S. 668, 43 S.Ct. 684, 67 L.Ed. 1167; United States v. 13.40 Acres of Land in City of Richmond, D.C., 56 F.Supp. 535.

5 United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L. Ed. 311, 156 A.L.R. 390; United States v. Katz Drug Co., 8 Cir., 150 F.2d 681.

repairs, such as painting, as could be superficially accomplished. Actual cost of replacing or repairing certain of the fixtures was shown, but, as to the greater part, only estimates were given based upon calculations as to longevity of the fixtures and the percentage by which remaining usefulness was reduced by excessive government use. For the alleged damage to the bath room fixtures, the defendant claims damage in the sum of $17,508.00.

(c) Stencils. Some of the decorative wall stencils were damaged during government occupancy to such an extent that the defendant painted over them. The great majority of the stencils are still on the walls, but some show the effects of injury. Estimates were given as to the cost of restoring the stencils to their original condition, after deducting a portion of their longevity as not being attributable to use during government occupancy. For the alleged damage to the stencils, the defendant claims damage in the sum of $18,910.00.

■ For none of the damages claimed with respect to the three categories above described, has the defendant expended any money by way of replacement or repair. Except as to the bath room fixtures, the evidence, in my opinion, is too speculative and conjectural upon which to base an award. The alleged damage to the stucco walls and stencils in no way affects the functioning or utility of the premises as a hotel. It is intangible and, in a manner of speaking, of an esthetic nature. It involves the appearance, in point of color and taste, of the interior decorative scheme. Against the background of principles applicable to the payment of compensation in condemnation causes, no basis can be found upon which to admeasure compensation. There is no evidence that the market value of defendant's interest in the property as a going hotel has been lessened. Nor does it appear from any evidence that the defendant plans or expects to make any further expenditure of a restorative character as to the walls or stencils. Neither does it appear from any evidence that there is any lessening or decreasing in business income affecting the

rental value of the property. Consequently I find no justification in law or in the evidence for calculating or allowing, upon such a speculative or conjectural basis as is here presented, any award for damages with respect to the stucco walls or stencils.

■ However the claimed damage with respect to the bath room fixtures has, to a certain extent, some substance and reality. At least this is so to the extent that there is a lawful basis for an award. Having in mind the testimony of the witnesses on both sides with respect to the bath room fixtures and my own inspection, I am satisfied an award for damage to the bath room fixtures should be made but not to the extent claimed by the defendant. This is for the reason that a substantial part of the claim is predicated upon estimates necessarily speculative and conjectural. My appraisal of the allowable items of damage with respect to the bath room fixtures is the sum of $4,000.00.

## Damage to Wild Flower Garden.

Defendant claims damage in the sum of $58,216.82 which it asserts is the reasonable cost of replacing the eight acre wild flower garden alleged to have been destroyed as a result of the erection of out-buildings and due to failure of upkeep by the government while in occupancy of the premises. The evidence without dispute demonstrated that the wild flower gardens were so destroyed. Expert and other witnesses for the defendant testified that the cost of collecting the various varieties of bulbs, preparing the ground and planting, including upkeep until full development was achieved, was approximately $29,000.00. However it appears that almost two-thirds of this amount was expended over several years in connection with care and upkeep. The claimed damage of $58,216.82 rests upon the conclusion of defendant's expert witness that it would cost twice as much today for the garden as it did originally. The purpose of the wild flower garden was both esthetic and also to display the various wild flowers of the Sierras. A government expert witness testified that the garden could be duplicated for an ex-

penditure of $2500.00. Again we have an extraordinary divergence as to values.

I am satisfied that a fair and reasonable allowance, having in mind all of the evidentiary and visual factors, would be the sum of $5,000.00 and such will be the award.

### Recapitulation.

| | |
|---|---|
| Rental value | $256,600.00 |
| Restoration of hotel and cottages | 85,548.76 |
| Restoration of gardens and golf course | 14,692.73 |
| Restoration of furniture and equipment | 60,993.17 |
| Deprivation of use after surrender | 45,067.00 |
| Damage to bathrooms, not repaired | 4,000.00 |
| Damage to wild flower garden | 5,000.00 |
| Total | $471,901.66 |

A unique factual issue confronted the "judge-appraiser" in this cause. The defendant corporation is not in the status of the ordinary property owner whose interest has fallen before the paramount force of public authority. Its rights and interests were not clothed with the fixed and certain habilaments of private property ownership. Rather did they depend upon a special contract with the United States, identified with a distinctive public enterprise. The investment which defendant made might never be recouped except out of earnings.[6]

In this setting, I have endeavored to fairly apply applicable standards. In the Constitutional sense, the awards I have made, in my opinion, constitute fair and "just compensation."

Judgment may be entered according to the views herein expressed upon Findings to be presented pursuant to the Rules of this court.

### Order Re Allowance of Interest.

1. Defendants claim that the judgment herein should include an award for interest computed from June 7, 1943 (the date of taking) upon the amounts allowed for restoration costs. It is contended that the award for restoration expense constitutes compensation for a "right" taken on June 7, 1943 and therefore should bear interest from the date of taking, citing United States v. 60,000 Square Feet of Land, D.C., 53 F.Supp. 767. But the "right" taken in United States v. 60,000 Square Feet of Land, etc., was measured by a claimed diminution of value of the property taken. Here the damage was physical, measured in terms of cost of repairs and restoration. It was an unliquidated demand. The mandate of the Fifth Amendment does not, in my opinion, require an award of interest.

2. The award for the use of the premises for the six months period from June to December 1946 should bear interest from June 30, 1946 and it is so ordered.

Present amended findings accordingly.

---

6 The following paragraph of the agreement of October 1, 1932 is illuminating:

"Whereas, pursuant to plans of the government for better taking care of visitors in the national parks by the establishment of more modern and extended facilities therein looking for some time to the future, outlined by the Secretary of the Interior to the various public utility operators at a conference held in Washington, D.C., on December 6 and 7, 1929, the said Company has formulated plans for improved and extended services in the Yosemite National Park, including the provision of similar services in the recent addition to the park under proclamation of the President dated August 13, 1932, and is ready and willing to conduct its operations in said park on the basis of said improved and extended facilities, *subject to the extension of the term of its operating contract for the full period authorized in law, namely twenty (20) years, in order to justify the total expenditure contemplated therefor.*" (Italics supplied).