**UNITED STATES v. 0.84 ACRES OF LAND, MORE OR LESS, IN CONTRA COSTA COUNTY, Cal., et al.**

No. 30320.

United States District Court
N. D. California, S. D.

May 21, 1953.

M. Mitchell Bourquin and John E. Lynch, Sp. Assts. to U. S. Atty., San Francisco, Cal., for plaintiff.

Stephen W. Downey, John F. Downey, Downey, Brand, Seymour & Rohwer, Sacramento, Cal., for defendant East Contra Costa Irr. Dist.

GOODMAN, District Judge.

In order to facilitate its project in the Central Valley of California, the Bureau of Reclamation of the Department of the Interior of the United States found it necessary to construct high voltage electric transmission wires to bring electric power into the Valley. The Bureau's transmission lines at one point cross over and above the canal of the defendant East Contra Costa Irrigation District in the County of Contra Costa and over a span of the District's electric distribution lines. Pursuant to statutory authority,[1] the Secretary of the Interior, on behalf of the United States, on January

9. Carlander v. Dubuque Fire & Marine Ins. Co., D.C.Ark., 87 F.Supp. 65, 69.

1. 46 Stat. 1421, 40 U.S.C.A. § 258a.

29, 1951 filed in this court its Declaration, whereby it took the right and privilege of maintaining the Bureau's transmission lines at right angles across the District's property, subject to all existing rights of way of the District for its canals, ditches, electric transmission lines, etc. Coincidentally the United States filed a complaint in condemnation. In the Declaration, the value of the privilege or right taken was stated to be $1. It amounted to no more than an air passage over the District's canal, ditches and electric lines. The District, in its answer, alleged that the right or privilege taken by the government created a risk and hazard to the District; that it was necessary for it to relocate a portion of its own distribution lines, over which the Bureau's transmission lines passed, by placing them under ground, at a cost estimated at approximately $10,500; that said sum was just compensation for the estate and right taken. At the trial, evidence produced by the District showed the actual cost of relocating defendant's transmission lines underground, at the point where the Bureau's lines passed over, was $6,128.40, which sum the District then claimed to be recoverable by it herein as just compensation.

The claim of the defendant is novel. The government took no part of the physical properties of the District; it took no part of the District's span of lines which the latter relocated underground. No function of the facilities of the defendant was in any way interrupted by the taking. The question is: What is just compensation in the constitutional sense, Constitution, Amendment 5, for the right or privilege condemned?

■ The rule is clear that a taking of a facility or appurtenance of property, which causes the condemnee to substitute another facility or appurtenance therefor, requires the payment, by way of just compensation to the condemnee, of the market value or cost of the substitute.[2]

Since no facility or appurtenance was taken, neither logic or authority justifies the application of this rule here.

The basis of the defendant's claim is that there is a possibility of the high voltage lines of the Bureau breaking at the point where they cross above the District's lines; and that contact of such broken lines with the distribution lines of the District could cause a breakdown of the entire pumping system of the District, and thus shut off for a long time the supply of water to the farmers serviced by the District. This, it is asserted, would cause irreparable farm damage running into millions of dollars, particularly if the break should occur at a time when water distribution to the farmers is currently imperative.

■ The claim thus made is, in one sense, a species of severance damage, although not so designated. The essence of such damage is injury to property of the District not taken.[3] But this type of damage is measured by diminution of the market value of the part not taken.[4] And no such claim was made nor was any evidence in its support presented.

In another sense, the claim might be likened to some form of consequential damage. This seems to be the most appropriate category in which to classify the District's claim.[5]

The evidence shows, and indeed it is conceded, that the possibility of a break in the Bureau's lines at the place where they cross the District's lines is "remote." Mathematical calculations, based on a sum-

2. U. S. v. Los Angeles County, 9 Cir., 1947, 163 F.2d 124; State of California v. U. S., 9 Cir., 1948, 169 F.2d 914, 924.

3. U. S. v. Miller, 1943, 317 U.S. 369, 376, 63 S.Ct. 276, 87 L.Ed. 336; U. S. v. 711.-57 Acres in Eden Township, D.C.N.D. Cal.1943, 51 F.Supp. 30, 33.

4. Bauman v. Ross, 1897, 167 U.S. 548, 574, 17 S.Ct. 966, 42 L.Ed. 270.

5. It was only after U. S. v. General Motors Corp., 1944, 323 U.S. 373, 65 S.Ct. 357, that damages of a consequential nature were allowed, although General Motors did not purport to overrule Mitchell v. U. S., 1925, 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644, which had affirmed the established doctrine that consequential damages were not allowable in condemnation causes. See U. S. v. 37.15 Acres of Land, D.C.N.D.Calif., 1948, 77 F.Supp. 798, 803.

mary of the records of over 60 power companies in the United States and Canada, indicate that the factor of breakage of electric transmission lines of the kind erected by the Bureau, in the length of span equal to that which crosses the District's lines here, is once in over 3000 years. In addition, there is evidence that the circuit-breakers of the Bureau's lines would to some extent minimize the danger from such a break, if it did occur, because of the likelihood of the Bureau's lines being de-energized before contacting the District's lines. The evidence also showed that it is not uncommon in the area for high voltage lines to cross over lower voltage lines. In fact, it appears that the Pacific Gas & Electric line, which furnishes power to the District's lines, is itself crossed, at least 16 times in the immediate vicinity, by high voltage lines.

In many enterprises, it may be deemed advisable to provide certain insurance or safeguards to absolutely protect against a hazard even of the most remote character, because of the extreme value of the property rights involved. The freedom of choice to do that rests in the owner. His decision need not be measured by any standard except his own desire. But when it is sought to make *someone else* pay for the insurance or safeguard, as in the field of eminent domain, compliance with constitutional and legal standards is an essential condition.

So the mere fact that the Directors of the District employed an engineer, who advised putting the District's lines underground, is not sufficient.

Although I do not infer that it is so in this case, years of experience in condemnation cases has shown that many property owners have no significant diffidence in their demands. What they would hardly think of doing, if *they* had to bear the cost, becomes an essential when someone else can be made to pay. In all fairness, it must also be said that sometimes, but not often, there is exaggerated minimization [6] of value by the condemnor.

An expert employed by the District advised it to put its wires underground at the crossing point. He testified that he based his opinion upon certain data which he had collected. He spoke of the possibility of an aeroplane colliding with the wires, of a person shooting a bullet and hitting the wires and the like. He gave some incidents of this kind, not many in number, which he had heard or read about. Also a few instances of other causes of line breakage.

But all this means only that in hundreds of miles of wire, there might be 4 or 5 breaks in as many years. To create a hazard here, we must hypothecate not only the remote probability factor of a break in the whole line, but in addition a break at the precise place of crossing, and, further, a break at the exact point where a broken wire would actually contact or affect the District's wire.

In my opinion, such conjecture and speculation is not translatable into legally anticipatable damage.

There might be a reasonable need to station a traffic officer at an intersection where 500 automobiles passed in a day, but *no* need to do so at a place where one auto passed in 500 days.

It is appropriate here to point out that, aside from the alleged hazard of the Bureau's lines, we could speculate as to many dangers or hazards which might cause an expert to advise that all or any part of the District's lines should be underground.

A further contention is made by the District that the alleged enormity of damage resulting from a long interruption in function, is in itself a persuasive reason in support of the claim made. But I find no reason or authority, in the constitutional sense, to support such a theory.

■■ Just compensation means the restoration of the owner, after the taking, as near as may be, to his value position before the taking. The award here sought, upon the record, can be justified only by resort

6. U. S. v. 37.15 Acres of Land, D.C.N.D. Calif.1948, 77 F.Supp. 798; U. S. v. 13.40 Acres of Land in City of Richmond, N.D.Calif., D.C., 1944, 56 F.Supp. 535.

to speculation, surmise or probability theories. Indeed, if granted, it would have the effect of improving and enhancing the property owner's status. This, the Constitution did not bind the government to do.

The claim of the District cannot be sustained for more than the nominal amount deposited.

Present findings accordingly.